And we will next take up National Elev. Ind. Pension Fund v. Flex. Good afternoon, Your Honors. This is Michael Rogers for the plaintiffs, although it's actually, I would say, it's a good evening here. We've covered a lot of ground in our papers, so I'm going to try to focus on what I think is the prominent issue that was dealt with below and also the prominent issue that was dealt with in our papers, which is the falsity prong under 10b, which of course is one of the elements that's required. And it largely arises and falls on the way the Court will look at the issue of, a, the reliability of confidential witnesses, and, b, the veracity of the allegations of those confidential witnesses as it relates to the falsity prong. I think we're going to be probably talking a lot today about this Court's ruling in the Zucco case, so I think I'll begin with a quotation from the Zucco case. CWs may be relied upon where they are described with sufficient particularity to support the probability that a person in the position would possess the information alleged. And that word probability is a key, and I think it's what we need to focus on today. That word is not certainty. It's not absolute. It's probability. And in this case, where I'm sure the Court has read the voluminous record before it, each CW has been described with enough detail to explain how and why that CW was in the position to know that information. Just for the sake of the record, we can all acknowledge that CWs 1, 2, and 5 have not been challenged on the reliability prong, and the Court below did not rule on that. Now, the defendants and the district court below have attacked and challenged the reliability primarily on three grounds. Shearsay, what the court below phrased as a quote-unquote timing mismatch, and the fact of whether the CWs did or did not work on the Nike project. For the reasons I'll explain in a moment, none of those three reasons pass muster, either as a matter of law or based on the facts of the case. We'll begin, if it's all right, with the personal knowledge aspect. Now, it's fairly well established from the courts, including Zucco and others, that personal knowledge does not necessarily mean firsthand knowledge. Indeed, Zucco has said that a complaint must provide an adequate basis for determining that a witness in question has personal knowledge of the events they report. And as this court has reported in the lifelock matter, quoting from Zucco, then it goes on to say, Instead, we examine the confidential witnesses' shearsay report to determine if it is sufficiently reliable, plausible, and coherent. So, the confidential witnesses 3, 4, and 7 that we largely rely upon, and that are at issue under prong 1 of Zucco, the reliability standard, they're based on personal knowledge and not what the courts and the district court below and Ms. Brody have termed as, quote-unquote, vague hearsay. For example, the CWs at issue in Zucco were said to have engaged in multiple layers of hearsay. In one case, I believe it was actually triple hearsay. If I can give one example, confidential witness 3, who the district court below unfavorably compared to the confidential witness in Zucco, in that they both worked in the human resources department. Now, in Zucco, the court said that human resources professional, quote-unquote, had no first-hand knowledge of the workings of the finance or corporate departments. That's at page 996. CW 3, in our case, who indeed also did work in human resources, we allege that she attended weekly meetings in Guadalajara, led by the plant manager, attended by all departments where production problems on the Nike project were discussed and at which there was a PowerPoint presentation detailing production problems with the Nike products and the number of products that were being rejected. We find that to be largely distinguishable from the facts in Zucco. I can also give certain examples for CWs 7 and 4. Happy to do so if the court would like to hear it, but for the sake of efficiency, I won't repeat what's in our brief. The second point that Ms. Brody has argued and that the district court below ruled upon was the question of whether a witness needs to be at the company in question during the entire class period. There was no challenge to CWs 3 or 7 on that grounds. There was a challenge to CW 6. Quality Systems, obviously working off of the precedent set by Zucco, has acknowledged that although a witness was not at Quality Systems during the class period, that witness had personal knowledge, that the executive level management had real-time access to the sales reports at issue. Now, even if the court here were to find that unpersuasive, looking to Zucco itself, two of the confidential witnesses in Zucco were employed at the company at no time during the class period. And I believe, if I remember, and I can look back at the case, they never even worked for the company in question. Now, in our case, the district court found confidential witness 6 unreliable because of a quote-unquote timing mismatch in that she left Flex at some time before the end of the class period. That's true. The court doesn't point out, however, that the CW was at Flex for a time period of 12 of the 14 misstatements that are remaining in the case. And again, I want to go back to the language of Zucco. It's not an absolute level of proof. What is more probable than not in establishing the reliability? The final point on the reliability prompt, and then I'll be happy to move on to prompt 2 of Zucco, is whether one does or does not work on the project in question. CW 7, for example, is someone that Ms. Brody has attacked and the district court adopted in that this individual worked in the finance department at the corporate level where the quote-unquote profitability statements at issue were dealt with. Now, that individual did not work on Nike, but nevertheless, that individual worked at that department. She acknowledged that Nike was an extremely important contract to the company. That's something the individual defendants themselves have acknowledged. She also had contact with many individuals who worked in Guadalajara. So, again, this idea that there must be this perfect alignment between someone working on every aspect of the project at issue, that's not the standard under Zucco, and it's not the standard in any case. Again, I could offer similar facts for 4 and 3. I don't want to belabor it. We've briefed it quite extensively. Now, prompt 2 of Zucco looks to the veracity or the indicia of those allegations to support the falsity that's at issue. Now, the court below and both parties have acknowledged this. This is not a controversial issue, have basically divided them into two sets of statements. They're called the operational statements, which in a very general level relate to the question of were they producing enough sneakers in the Guadalajara facility to meet Nike's requirements, and then there are the profitability statements, which get to the issue of were they going to be able to hit these break-even points to which they promised. Which statements would you say are – you have a lot of statements that you claim are actionable. Which ones do you think are the most problematic for Flex? For Flex? In other words, your best ones. I followed you there, Your Honor. I would say that statements 2 and 4 and possibly statement 12 on the operational statements are among the strongest. For example, statement 2 deals with the question of whether Nike's – you'll have to excuse me. I have a lot of paper in front of me. I want to be accurate. Statement 2 is the one that went to the question of was there early automation success. Question 4 is the one that relates to the question of were they on the design curve. And I'll get to the point if the court wants to hear it that Judge dismissed number 5 on puffery and Ms. Brody's attacking those on puffery grounds. But I would like to hear why statement 2 was false. I mean, it seems pretty low bar whether or not something has early success. Well, I think the way that I would answer that is that we have indications from the CWs in question that as far back as February of 2017, now that predates the beginning of the class period by two months, that – this is CW2 – that Nike was scrapping about 50% of its product, which as we know was far short of the 93 to 96% that was required by Nike. And CW4 has also said, as well as other CWs, but CW4 said that Nike contract was behind from the get-go. The problem with that, though, counsel, is that we don't know what the benchmark that Flex had for the scrapping, right? So even though Nike had a benchmark and at that point we don't know what Flex's benchmark was, so they might have been making that benchmark. Well, no, I do respect your honor. I don't agree. If I have a contract with a large company and that company demands that I scrap nothing less than 4% to 7% and I'm scrapping 50%, then I'm falling below my benchmarks, my independent benchmark. Well, I mean, a company – when you make a contract with a company, I'm sure there's some time that you need to get to that benchmark. And so whenever that statement was made, we don't know if that – what the benchmark that Flex had at that point. So they might have been on target to make that – my point is they might have been on target to make the 4% to 5% rejection rate, but we just don't know. Well, that's not what they're saying in Statement 2 with all respect. Statement 2 is saying we are experiencing early successes. And Statement 4 – sorry, I'm answering your question. I'm trying to conflate. No, I get it. Yeah, go for it. The design being on the production curve, if you're scrapping 50% when you're only supposed to be scrapping 4% to 7%, regardless of whether you think you might be on the path to make those benchmarks, you're not making them. The operational statements are in no way, shape, or form forward-looking. As a matter of fact, I see that I'm running low. I'm going to reserve some of my time because I suspect Ms. Brody may bring up the forward-looking aspects, which is not before us from the district court's ruling. But I will answer your question, Your Honor. Yeah, I mean, can I – if I could ask, I mean, like, it says we're having early automation successes. It doesn't quantify or detail which successes it's referring to. I mean, turning on the machine is an early automation success, right? Well, again, Your Honor, I don't agree with that because we're dealing with a company that's making public statements to the market through analysts who are closely following the company. They'd already told them that effectively, I'm making a colloquial statement. They didn't say this. It's a bet-the-company kind of contract. This Nike contract was huge. That's not the point here. So the idea of saying two months after the CW's allegations that we're achieving early successes when by any normal measure under common sense, they're failing. They're not making it. In other words, this is a duty to disclose. We briefed that. I'm more than happy to get into that. I think the court probably knows the law under COJA, under the other Ninth Circuit cases, about duty to disclose. By saying in Guadalajara we're achieving early successes, there's a duty to explain what that means and what that meant is they were hitting about a 50 percent scrap rate. Now, of course, under COJA and other cases, had they not said anything about early successes, they have no duty to disclose that scrap rate. I agree with that. But they're speaking to analysts who are extremely interested in the progress of the Nike contract. Again, I see that I have about three minutes left. I would like to reserve what I have left to respond to what Ms. Brody said. Right. Why don't you reserve that and we'll hear from Ms. Brody. Thank you. Thank you. I guess, Ms. Brody, maybe you could just leap in and respond to the last argument, for example, in statements, the current statements number two and four. If, in fact, they were not even close to meeting the ultimate benchmark of four to seven percent scrap and the full production curve, why aren't these statements false? The statements aren't statements saying we've met our benchmarks. The statements are statements. Statement two, for example, is about automation and design success. Statement four is the same. And statement 12 is a statement by Defendant McNamara that Nike had released a full set of designs and the operation was beginning to ramp. So they're not statements saying we've met our goal. They're statements saying we're doing some things and we're making progress. And there are no allegations in the complaint to show otherwise. In fact, if you look at the confidential witness allegations, you'll see that one of the confidential witnesses says when they moved into the new facility in Guadalajara, they moved from two lines of operation to six lines of operation, which is moving towards one's goal, which is automation, which is some success. And another of the confidential witnesses, for example, says they're producing 20,000 Class A sneakers a day, which is a lot of Class A sneakers. So, again, it's not a situation where they're not producing any or none of them are hitting the quality level that Nike has asked for. In fact, they have a lot. So the allegations even by the confidential witnesses, rather than showing falsity, because with respect to what was happening at the operations and moving forward, and these are statements that Mr. Rogers focused on that deal with operations issues that don't match up. And it also needs to all be considered. So one case that I think is particularly instructive on this for the court to consider is the Wacos case, the Tesla case. And in that situation, although there were some challenges going on, the statements were that they were, you know, similar to the statements here by Flex, that they were seeing some success. Again, the court said it doesn't need to be perfect, don't need to be all the way there, but that they're making some progress on the matter. So, and then I think it's also important to consider all of this within the totality of what gets said to the market. If you, in our papers, we go through in tremendous detail all of the disclosures by Flex of the challenges of this project. Flex didn't at all pretend that this was going to be an easy project. From the very beginning, it said, you know, making sneakers is hard, and making sneakers in an automated way is going to be hard, and it's going to take us a long time. There's a reference by Mr. McNamara of, you know, this could be a 10-year ramp. So all of these statements about we're making progress, again, not a single confidential witness saying that they're not, have to also be considered in the context of the totality of the statements that are made. I think when you look at this case, I think it's important to, again, think about the context in which the case is brought. This is actually a fairly familiar business situation. Here we have a company, Flex, that undertook a brand new line of business, automating the production of sneakers. It said it was going to be hard, and then after a number of years of substantial effort in trying to make the project work, determined that it wasn't going to be sufficiently profitable, and shut it down. That does not make it a securities fraud case. That happens all the time in business. You undertake a difficult project. You tell the market, if you're a public company, what you were doing. You tell the market that it's going to be hard. You work at it, and sometimes you succeed, and sometimes you do not. There is nothing in this case and in the complaint to suggest that there's anything other than that. One problem I have is that Flex did continue to paint a rosy picture pretty close to the deadline when they said that they would be profitable, and at some point it must have been clear that they weren't going to make that profitability. What was the deadline? It was Q4 of 2017? Flex actually moved the deadline out a number of times, which is actually, I think, significant. Flex was working on this project. It had predictions, forward-looking statements, which need to be then considered as one would consider a forward-looking statement, and looked at through the lens of, you know, was it false when it was made, and none of the CWs here say anything about Flex not, you know, the speakers at Flex not having, one, that the statement was not true when it was made, predictions into the future, that they knew that they weren't going to make the timing in the future, or that the predictions were not, you know, honestly held by the speakers. So those are all forward-looking statements, predictions into the future. They, if you look at the record, what you'll see is that the timing of when the company would hit profitability on this project moved out a couple of times. And I actually think that that's pretty important when you think about what's going on and what the market is being told. You know, it's not a, it's a, we think we're going to make it sometime in the future, and then as they approach that time, they tell the market, we're not making it, we're going to kick it out further in time, we're continuing to work on this. What was the deadline, the last deadline given before it was pulled, the contract, they pulled the plug on the contract? The second half of fiscal year 2019, and they pulled the contract quite a bit before that. Second half, okay. So the district court, in finding that there were, the statements were not sufficiently alleged to be false, only looked at falsity, looked at the two categories of statements, or in terms of what the district court ruled on, the two sort of buckets or categories of statements, the operational statements, which the district court found were not sufficiently alleged to have indicia of falsity, and frankly don't go to the ultimate complaint that the plaintiffs have here, which has to do with profitability. And then also the forward-looking statements, the predictions of when profitability would be hit. On the first point, just before you move to that second piece, and the plaintiffs I think essentially say the district court was being just too, demanding too much of us at the pleading stage. There's a reasonable relationship between production, the capabilities and the workings of the production and profitability, and that's sufficient at least at the motion to dismiss stage. So can you respond to that? I think that what the plaintiffs are saying here is that they can draw inferences that go substantially beyond what the CWs allege, and the district court looked at that and determined that based on what had been alleged, it was not sufficient and it didn't go to the issues. Again, if you look at the case law, it's pretty clear. Having some operational challenges doesn't mean that your project is not moving forward. The cases have been quite clear on that, and in addition that's sort of common sense, that the two pieces don't match up. So I think what the district court did here, and of course this court is free to consider the allegations and the complaint and the sufficiency of the falsity de novo, but what the district court did here is look at what was alleged and say, well, it just doesn't tie up to the theory. And again, you have to look at it in the context of the totality of everything that's being said. So the statement that I think is the strongest for National Elevator is actually 11, where it says we just finished up Q3 where we again saw some further losses, but Q4 is where we're focusing the breakeven as we exit the year. I mean, if I'm wrong, isn't that just like three or four months away? And to say that you go from operating losses then in four months you think you're going to turn a profit, that seems hard to believe given all the other problems going on. Well, breakeven, they didn't say turn a profit. Oh, sorry, yes, thank you. Breakeven is not turn a profit. Fair, fair, fair. It is forward in time. It is still a forward-looking statement and a prediction. There are no allegations in the complaint that when Mr. Kessel made that statement, there was anything contradictory known at the company. So it's not one of these situations, and we've all seen these cases where the allegations are that one of the defendants made a statement that something was going to happen and at the same moment had internal reports that said to him, no way, that is not going to be happening, either ever or certainly in the time period in which you're talking about. There's nothing like that. The closest the plaintiffs come, which is not even in the realm of showing that it was false at the time, is trying to look to their CW7, I believe, who is the corporate finance person who doesn't say the predictions about Nike are wrong and certainly doesn't say that at the time that Mr. Kessel made that statement he knew that it wasn't true or that even it wasn't true. Instead, the only thing that that confidential witness says is Flex has very sophisticated forecasting. Well, you can have very sophisticated forecasting and be wrong, particularly when you're wrong about profitability, particularly when something like profitability requires not just how it is operating for you but the price at which the counterparty is going to pay you. So there's so much— Can I just ask you a factual question on that? So that statement was made on February 14, 2018, and then it says Q4 is what we're focused on for break-even. When is Q4? When would a Q4 have ended? Oh, great question, Your Honor. I'm going to get you that answer in just a minute because it's not coming to mind. March 31 of that year. Well, so that seems like six weeks, right? So, yes, I mean, it is close in time, but again, there doesn't mean—since we're talking about break-even, we're talking about both, as the district court pointed out, the price at which the counterparty would pay and what it would cost to produce. And then there's nothing in the record to show that it was known not to be true at the time that it was said. And then— But knowing what we know now, it seems very unbelievable that the company would have believed that, but I don't know. Well, that's been— That's hindsight, right? Yeah, respectfully, that's simply hindsight. And again, nothing in the record to show that anything different was known at the time. So, you know, to wrap up the forward-looking statements and that portion of the challenge statements, the plaintiffs in the amended consolidated complaint would have needed to show both that the statements were false at the time and also that the speaker did not believe that they were true when the speaker made that statement. So, you know, with respect to the statement that, Judge Bumate, you are focused on, which is the statement by Mr. Kessel, there's absolutely nothing in the record to show that there's a reason for him— that there's anything that he doesn't believe that it's true when he made the statement. So, I think that is an independent ground on which the court could affirm what the district court determined with respect to this case. And finally, I just want to touch very quickly on the topic of scienter. Again, this is not a ground that the district court ruled on because the district court determined that it wasn't necessary to get to the question of scienter, but it is a live issue at this appeal and a separate independent ground upon which the court may affirm the district court's dismissal. The plaintiff's only argument with respect to scienter is that the core operations theory should be sufficient. That is that it was an important central operation to the company and therefore the defendants must have known about it. In order to plead scienter under Zucco and Kutera, as this court knows, they must show that the false statements were either intentional or deliberately recklessness. They have not. And they must, for forward-looking statements, show actual knowledge. Here, remember, the defendants disclosed the operational issues and the core issues here, particularly with forward-looking statements, with all of them, are about profitability. There are no facts to show that any defendants knew the statements were false. With respect to Mr. Kessel and Mr. Collier, they're not even alleged to have been involved in the operations at Guadalajara, so no connection there. And finally, the entire theory really doesn't make sense. The theory requires everyone to believe that, starting from the beginning of time, and this is what the plaintiffs suggest, back in 2015 the defendants knew that this operation was not going to ever be successful, yet over quite a number of years they invested a lot of time and money into an operation, which, according to the plaintiffs, they knew would never be successful. And that's really illogical, and there's no basis to suggest that that would be the case. All right. Thank you, counsel. Thank you. Mr. Rogers. All right. There's a lot to unpack, so let me dive right in. Ms. Brody has referred a few times to the disclosures. I believe what she's referring to is July 27, 2017, which, by the way, Judge Palmate, that is the only time they pushed back the deadline. I think Ms. Brody might have implied that there were multiple pushings back. There was one pushback. More importantly, What was the date of the pushback again? I'm sorry. July 27, 2017. But more importantly, what they told the market was that there were increased costs on the contract, there was difficulty forecasting costs, there were factory investment costs. So this purported disclosure completely ignored what we have alleged and what the CWs have alleged was actually causing the problems. Again, we briefed that extensively. I won't belabor that. Ms. Brody looked quite a bit to the profitability questions in response to, I believe it was Judge Bress's question. I find it notable that Ms. Brody said that the allegations, excuse me, the inferences cannot go beyond what the CWs say, and then Ms. Brody invoked the concept of common sense. But that's precisely what it is that we've alleged and what we're arguing. The CWs point out, again, plaintiff's lawyers have this habit of always saying, this is a very simple case, but I'm going to have to simplify what I'm saying right now. This is a case about making sneakers. So you make sneakers. Is Nike buying them? Are they not buying them? If you don't make sneakers, you don't get paid. If you're not able to make the sneakers properly and you're scrapping it, that scrap is a deadweight loss. That's a cost. If you're having to scramble to get additional shipments from Asia because you can't procure the proper materials, as we say in our brief, and I'm going to say it again, I've been along with Alan for many years, and I'm sure everyone in this court has been as well. When you want something on an expedited basis and you're desperate for it, it's not cheaper. It's more expensive. So under the simple formula that the district court keeps talking about, that profitability, or break-even in this case, is the relationship between revenue and cost. If the costs are going up, and they were, and the revenue is going down or not going up because you're not making enough sneakers, the profitability is going to be linked. Now, to look to the point that Judge Bumatayu made about Statement 11, it relates to all of the other statements that we're talking about. Ms. Brody wants to say that it's forward-looking. We've really quite extensively briefed the reasons why we say that it's not. There's a lot of present-day facts in a lot of those otherwise forward-looking statements. Tess has looked at that. So one way of reading that statement is that Mr. Kessler was saying we are focused on break-even by the end of this quarter. That could be true. They could be focused on it, even though they might have known that it was unlikely. If that was the only part of the statement, I might agree with you, Judge Wardlaw. However, the statement begins by saying we haven't made any changes to our view on Nike. That's a present-day statement, first of all, to distinguish between the forward and the present parts of it. But it's basically saying to these analysts who have been covering this company for a long time, we've been telling you all along, early successes, we're moving toward break-even, all the things they've been saying. There's no changes. As Judge Bumate asked, they're six weeks away from cancelling the contract entirely. It's completely beyond plausibility to assume that in six weeks they've discovered that the contract went from not working out really well. Say we agree with you. Say we agree with that point. What's in the record? I mean, what is in the record that shows that these people weren't deluding themselves, that they actually knew? Well, the reason is, is because Mr. – man, I'm drawing a blank on the man's name. Montgomery? The CEO, I'm just – again, I'm drawing a blank. McNamara. Yes, Mr. McNamara and Mr. Dennison went to Guadalajara on multiple occasions. We have multiple CWs corroborating the very same story over and over and over again. These two individuals were flying to Guadalajara multiple times during the course of the year and at times multiple times in a month to discuss the problems in the Nike contract. So the – Ms. Brody wants to say it's merely about core ops. There's a core operations aspect to this case. The Nike contract was the biggest thing they had going. But these individuals who are making most of the misstatements were in Guadalajara discovering and dealing with these problems on a regular basis. That's our – that's our allegation of not only scienter, but that's the actual knowledge under the safe harbor prong, too, because as the defendants have conceded and as the district court conceded, there's no cautionary language of any kind in connection with any of these statements. I see that I've gone over. If there's any more questions, I'm happy to answer them. I don't want to keep – It's okay. It's been a long day for everybody, especially you. Does anybody else have any other questions? No. Okay. Thank you, counsel. Very well argued. Thank you very much, Your Honors. So National Elevator Industry Pension Fund versus Flex is submitted, and this session is recorded. This is adjourned for today. Thank you. All rise. This court is adjourned.
judges: WARDLAW, BRESS, BUMATAY